FILED
2006 Feb-16  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

GARY LEE BECK,                    )
                                  )
            Plaintiff,            )
                                  )
vs.                               )        Case No.  7:02-cv-03050-LSC-HGD
                                  )
MICHAEL H. FEEHAN, et al.,        )
                                  )
            Defendants.           )

## **MEMORANDUM OPINION**

Plaintiff, Gary Lee Beck, has filed an action pursuant to 42 U.S.C. § 1983.[1] He

names as defendants Michael Feehan, Alabama Probation and Parole Officer;

Calhoun County Sheriff's Department Investigator Dewitt Ashley; Martha C. White,

Parole Board Hearing Officer; Kairy Crum, Classification Specialist; and Paul

Whaley II, Alabama Department of Corrections (DOC) Director of Classification. He

sues the defendants in their official and individual capacities. Plaintiff alleges that

rights, privileges, or immunities afforded him under the Constitution or laws of the

---

[1] Plaintiff originally filed his complaint in the United States District Court for the Middle District of Alabama. The action was transferred to this court on or about December 13, 2002. He subsequently filed amendments to his complaint to add additional defendants. (Docs. #4, 7, 21). The amended complaint filed September 29, 2004, (Doc. #21) contains all claims asserted by plaintiff and to be considered by the court.

United States have been abridged by defendants in connection with the revocation of his parole.

On May 16, 2005, the court entered an Order for Special Report directing that copies of the complaint in this action be forwarded to each of the named defendants and requesting that they file a special report addressing the factual allegations of the plaintiff's complaint.  The defendants were advised that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  By the same order, plaintiff was advised that after he received a copy of the special report submitted by the defendants he should file counter affidavits if he wished to rebut the matters presented by defendants in the special report.  Plaintiff was further advised that such affidavits should be filed within twenty days after receiving a copy of the defendants' special report.

On August 3, 2005, defendants Feehan and White filed a special report.  On September 6, 2005, defendants Crum and Whaley filed a special report.  The special reports were accompanied by copies of various documents related to the parole revocation proceedings and Beck's subsequent attempts to have the proceedings declared invalid, as well as affidavit evidence.  Thereafter, plaintiff was notified that he would have twenty days to respond to the motion for summary judgment, filing

affidavits or other material if he chose.  Plaintiff was advised of the consequences of any default or failure to comply with Fed.R.Civ. P. 56.  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  On August 16 and September 14, 2005, plaintiff filed responses to defendants' motions for summary judgment.

Plaintiff alleges in his complaint that defendant Feehan conspired with Christine Beck Daniels, plaintiff's ex-wife,[2] to file a false complaint against plaintiff for sexual crimes, physical abuse and drug abuse, for the purpose of having his parole revoked.  He claims Feehan had plaintiff falsely arrested on November 6, 2000, without a warrant and without a written statement of the parole violations allegedly committed by plaintiff.  He asserts the written statement of reasons was not prepared until November 20, 2000, and that the statements were knowingly false.  He also faults Feehan for not contacting plaintiff about the allegations made by plaintiff's ex-wife before having him arrested, inasmuch as Feehan allegedly was aware that Christine Beck Daniels was having mental problems.

Plaintiff further alleges that defendant Ashley violated his rights when he arrested plaintiff without probable cause on November 6, 2000, in that Ashley did not have a warrant of arrest or written statement by a parole officer of alleged parole

---

[2] Daniels originally was named as a defendant in this action, but plaintiff subsequently dismissed his claims against her.

3

violations.[3] Beck contends that defendant White violated his rights by accepting false testimony at the parole revocation hearing from Beck's ex-wife, when White knew Daniels had lied in a previous parole revocation proceeding. He also faults White for recommending that his parole be revoked without a thorough review of the record, and based on a condition that was not part of his unsupervised parole (change of residence without notification to parole officer) and for drug use when there was no evidence of recent drug use.

With respect to defendant Crum, a Classification Specialist at Bibb County Correctional Facility, Beck alleges that he has violated Beck's rights by using the false information in the parole violation report to restrict plaintiff's custody and deprive him of the opportunity to be transferred to an honor camp or be placed on work release. He also asserts that he has been wrongly classified as a sex offender despite having no charge or conviction for any sex offense. Beck alleges that a state court ruled in his favor on October 3, 2003, with respect to his claims for removal of false information in his institutional file, yet Crum has failed to remove the erroneous information. Defendant Whaley is alleged to have violated plaintiff's constitutional rights by not removing the false information from his institutional file despite the

---

[3] Beck has filed a motion to dismiss his claims against Ashley and to dismiss Ashley as a defendant, without prejudice. (Doc. #38). For the reasons set out *infra*, Ashley and the claims against Ashley are due to be dismissed with prejudice, thereby mooting plaintiff's motion.

4

state court order to do so.  He avers that Whaley has stated in an affidavit that he will not consider the allegations of sexual crimes in plaintiff's classification but nonetheless refers to plaintiff as a violent criminal predator.

Defendants contend that plaintiff's claims are barred by the statute of limitations.  Defendants White and Feehan claim absolute and qualified immunity from suit.  They also contend that Beck's parole revocation has not been declared judicially invalid; instead, the validity of the proceeding has been upheld.  Defendants Crum and Whaley assert that plaintiff has not been classified as a sex offender or placed in any particular classification based on the parole violation report.  Instead, he is classified as a restricted offender and deemed a violent criminal based on the facts of the underlying conviction for murder.

## SUMMARY JUDGMENT STANDARD

Because the special reports of the defendants are being considered motions for summary judgment, the Court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.  In making that assessment, the Court must view the evidence in a light most favorable to the non-moving party and

must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett, supra*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett, supra*; *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This

> rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.


## DISCUSSION

The court takes judicial notice of the case of *Gary Lee Beck v. Cheryl Price, et al.*, Case No. 7:02-cv-03013-SLB-HGD (N.D.Ala.).  In that case, Beck pursued a petition for writ of habeas corpus with respect to the parole revocation at issue here. On April 23, 2004, a report and recommendation was entered recommending that the petition be denied.   The district court adopted and accepted the report and recommendation and dismissed the petition on May 21, 2004.  After Beck filed a notice of appeal, the Eleventh Circuit Court of Appeals denied his applications to proceed on appeal *in forma pauperis* and for a certificate of appealability, on or about September 20, 2004.  The order was issued as mandate on or about November 8, 2004.

The facts as taken from the report and recommendation in *Beck v. Price* are as follows.  Beck was convicted of murder in the Circuit Court of Calhoun County on February 29, 1988, and sentenced to serve 20 years.  Beck was paroled from prison

on March 30, 1998.  After parole, Beck was placed under the supervision of Parole Officer Michael Feehan in Calhoun County.

On October 27, 2000, a parole officer's arrest authorization was issued for Beck for parole violations.  Beck was located and the warrant served on him on November 6, 2000, by an officer of the Calhoun County Sheriff's Department's Daybreak Crisis Recovery Center.  On or about November 20, 2000, Feehan issued a Report of Parole Violation, charging Beck with three parole violations.  In Charge 1, Feehan charged Beck with changing his residence without the consent of his parole officer.  Charge 2 accused Beck of using drugs or controlled substances illegally.  In Charge 3, it was asserted that Beck's continued release on parole was detrimental to the health and safety of Beck or to the welfare of society.

As a factual basis, the report stated that beginning in March 2000, Feehan began receiving calls and information from various persons that Beck was abusing drugs (primarily cocaine) and that he was abusing his wife.  In June 2000, Beck's wife reported he was using drugs again, but she had no firsthand knowledge.  She also indicated that Beck was physically abusing her and threatening her, but she would not press charges.  Several days later, the wife reported that she and Beck had worked out an arrangement for Beck to get drug and alcohol treatment and psychological counseling.  He also would move into a separate residence until his

8

recovery was underway.  Feehan further reported that Beck admitted to Feehan that

Beck needed substance abuse and other counseling.  On June 13, 2000, Beck was

instructed to call Feehan to report on his living arrangements pending treatment.

On June 15, 2000, Beck told Feehan his wife would live with her parents and

he would remain at their residence on Highway 77 in Ohatchee.  On June 21, 2000,

Beck called Feehan to advise he would be residing with his mother during the

separation from his wife.  Beck stated he could not remember the address but would

call back later with the information; however, he did not do so.  At Beck's next

monthly report, on July 7, 2000, he listed two addresses as his residence:  his

mother's and his residence on Highway 77.  Beck was sent a notice to contact his

parole officer immediately; he did so and reported he was living at the Highway 77

address.  The same address was given by Beck on his September 6, 2000, report.  On

September 29, 2000, Feehan received a report of additional violence by Beck against

his wife, which might result in criminal charges,  and drug abuse.  On October 4,

2000, Feehan sent a written notice to Beck, asking him to contact Feehan.  As of the

date of Feehan's written report, Beck had not responded to the request for contact.

On October 5, 2000, Feehan spoke with investigators in the Ohatchee Police

Department.  They were in the process of developing a case against Beck which they

believed would result in charges of rape, sodomy and promoting prostitution.  When

Beck failed to respond to the October 4 notice to report by October 27, 2000, Feehan went to the residence on Highway 77. He found the house vacant with the front door locks severely damaged. Feehan issued a parole officer's arrest authorization later that same day. Law enforcement investigators found Beck on November 6, 2000, and executed the arrest authorization. Feehan further stated in his report that investigations reveled that Beck had been residing with a third party for many weeks, but he failed to either report the change of address to Feehan or first obtain Feehan's permission to move.

With respect to the charge of using illegal drugs, Feehan wrote in his report that on October 5, 1998, Beck was given a routine drug screen that tested positive for cocaine. Beck admitted he had used cocaine during the previous weekend. Feehan referred Beck to a substance abuse program. On November 4, 1998, Beck reported that he was attending a group treatment program. However, on April 1, 1999, Beck advised Feehan he had relapsed and used cocaine two weeks prior. Feehan determined that because Beck voluntarily admitted his relapse, no steps beyond continued counseling were necessary at that time. Beck reported on October 1, 1999, that he was continuing with the treatment program. Feehan was advised by the mental health center on October 26, 1999, that Beck had successfully completed the counseling program on October 20, 1999. On March 22, 2000, Feehan began

10

receiving reports that Beck was using cocaine again; however, he felt he did not have enough details or information to justify new charges or a search. Feehan did increase the frequency and randomness of drug tests on Beck. On June 13, 2000, Feehan instructed Beck to come to the parole office. Beck told Feehan he needed substance abuse treatment and had contacted a treatment facility. Feehan did not give Beck a drug test that day; instead, he provided Beck with the number for a program in Gadsden for which Beck's insurance would pay. On June 15, 2000, Beck called Feehan as instructed to report that he had an appointment on June 20, 2000, at Southern Behavioral Health in Anniston. On June 21, 2000, Beck advised Feehan that he had an appointment to see a counselor on July 11, 2000, and an appointment with a doctor on July 18, 2000, regarding arrangement to enroll in and begin a substance abuse treatment program.

On September 29, 2000, Feehan received a report from Beck's wife that he was abusing her and abusing drugs again. When Feehan looked into this, he found that the Ohatchee Police Department was in the midst of an investigation into Beck that might result in the criminal charges mentioned above. There were several written and signed statements made to police investigators during interviews, by people who lived near, worked with or otherwise knew Beck, that he had been abusing cocaine and alcohol on numerous occasions in the preceding months in the presence of various

people, Beck also was talking freely about his drug and alcohol abuse among persons with whom he felt comfortable.  As of the date of the report, Beck had provided no proof of completion of the substance abuse program.

In support of the third charge, Feehan stated in his report that on March 22, 2000, he received a call from the Calhoun County Sheriff's Office to advise him that a deputy had been receiving four to five calls a day from an individual claiming Beck was threatening to "get rid of" his wife and her entire family if they caused him any problems.   The individual also claimed Beck was using cocaine nearly every weekend.  However, the person did not want Beck to be confronted directly and did not provide specific information to indicate personal knowledge of drug abuse. Feehan noted that Beck had been receiving random drug tests, all of which were negative more recently.  After this call, Feehan increased the frequency of the tests and his monitoring of Beck. In June 2000, Beck's wife, Christine Beck, contacted Feehan to complaint that Beck was abusing her and using drugs again.  However, she had no firsthand knowledge of the location of any drugs or other incriminating evidence and stated she was not filing any charges or reports against Beck with the police.  Feehan received further contact from Christine Beck on June 13, 2000, when she reported Beck was still abusing her and using drugs, as well as trying to get her to prostitute herself for money.  She still refused to make any formal report to police

or file charges, but Feehan gave her information about the local women's shelter. Later on June 13, Christine Beck reported to Feehan that she and Beck had made arrangements for Beck to get psychological and substance abuse treatment and for them to live separately during that time.  She also had made a police report but still did not wish to press charges.  Beck indicated to Feehan on that date that he was in need of substance abuse and other counseling.  On June 19, 2000, Feehan provided Beck with a brochure on a new domestic violence program available in the area.

During August and September 2000, Beck reported to Feehan that he and his wife were living together in the Highway 77 residence.  On September 29, 2000, Christine Beck came to Feehan's office to advise that Beck was abusing her and using drugs again.  Feehan advised her of her options, including contacting an attorney about a divorce and seeking criminal charges against Beck.  She followed Feehan's advice and filed formal complaints against Beck with the Ohatchee Police Department.  Feehan spoke with officers of that department on October 5, 2000, about the charges and their investigation.  On October 27, 2000, Feehan spoke with Investigator Ashley with the Calhoun County Sheriff's Department, who had taken over the investigation.  Ashley reported that he had compiled evidence which he had turned over to the District Attorney's office to pursue warrants for charges of first degree rape, sodomy and promoting prostitution.

13

In subsequent calls with the Assistant District Attorney on the case, Feehan determined that Christine Beck had entered counseling to stabilize her emotional situation, Beck was being sought for questioning, and pursuit of charges or warrants was suspended pending Christine Beck's progress through counseling. On November 8, 2000, Investigator Ashley located Beck and took him into custody based on Feehan's arrest authorization. On November 14, 2000, Ashley provided Feehan with copies of the investigative report and statements from Beck, Christine Beck and witnesses. Synopses of the statements of Christine Beck, Beck and three witnesses are included in Feehan's Report of Parole Violation.

On November 22, 2000, Beck was served with a Notice of Parole Court Hearing. The hearing was set for November 27, 2000, at 11:00 a.m. Beck signed acknowledgment of receiving a copy of the notice and waived any further notice of the hearing. Beck specifically stated he did not want any witnesses to be notified to be present for him and did not request an attorney to be present at the hearing on his behalf. On the date of the hearing, no attorney was present for Beck, and he did not request the presence of any witnesses. The hearing officer determined that Beck was guilty of all three charges of parole violation and that mitigating evidence offered by Beck did not outweigh the seriousness of the violations. She recommended that Beck's parole be revoked. The Alabama Board of Pardons and Paroles concurred in

14

the hearing officer's recommendation on February 7, 2001, and ordered that parole be revoked.

In her findings and recommendations, the parole hearing officer determined that Beck was guilty of changing his residence without the consent of his parole officer, based on Beck's admission that he did so.  Beck explained that he left his residence in October after a heated argument with his wife due to his drug problems and their lifestyle, but did not have an address to provide Feehan at that time.  The hearing officer also found Beck guilty of using drugs illegally, again based on his own admission.  Beck stated that he could go for long periods without drugs, but he started using drugs again when he filed for bankruptcy the previous year (1999) and was suffering from the stress of his financial situation and arguments with his wife about money.  Beck admitted using cocaine while on parole.

Beck denied the third charge against him.  The hearing officer heard from Beck, Feehan, Investigator Ashley and Christine Beck.  Feehan stated that Beck's wife had filed a complaint against Beck with the Ohatchee Police Department which included allegations of rape, sodomy and promoting prostitution. Feehan outlined the substance of the allegations of verbal, mental and physical abuse combined with drug use.  Feehan stated that Christine Beck had reported that Beck forced sex on her and forced her to have sex with other men to obtain drugs.  The subsequent investigation

15

resulted in statements by others which supported Christine Beck's allegations.[4]  Beck denied ever threatening anyone in his wife's family, and Beck and Feehan stated that someone in her family had threatened him.  He also denied hitting his wife until she hit him, after finding Beck with another woman.   Ashley stated that he had investigated the allegations made against Beck by Christine Beck and no warrants had been issued at that time, but the District Attorney's office was reviewing the allegations and investigation to determine charges.  Beck brought out that he was cooperative in making arrangements to meet with Ashley to turn himself in on the parole officer's warrant, to dispel the idea that law enforcement authorities had to track him down.

Christine Beck stated she and Beck initially had a good marriage, but Beck began using drugs and introduced her to crack cocaine.  She stopped using drugs while Beck was in prison from 1996 to 1998.  She further stated that once Beck was released from prison, he started using cocaine again and began to use her sexually to get drugs.  She averred that Beck forced her to have sex with other men for drugs (or money to buy drugs) and forced her to have sex with him and gave detailed information about the incidents.  She expressed fear of Beck and that she wanted him

---

[4] The hearing officer stated she did not consider those statements because the witnesses were not present at the hearing.

16

to be incarcerated to keep him away from drugs and get him some help.  During questioning by Beck, his wife stated that she felt forced into sex with others because she was prevented from leaving when she wanted to and knew Beck would beat her up if she did not do what he said.  Beck also admitted he had allowed men to have sex with his wife in exchange for drugs but he thought it was by agreement.   In mitigation, Beck stated he was paroled in for the first time in 1992 after serving five and a half years and never received a disciplinary while in prison.  After his last parole, he held steady employment and earned a good wage and had not been the subject of any new criminal charges.  He did admit to a drug problem for which he wanted to receive rehabilitation treatment, as well as treatment for stress.

        In his habeas corpus petition, Beck claimed that he was denied due process in connection with the revocation proceedings and that his parole should not have been revoked based on the allegations and evidence presented.  He also asserted that he was falsely arrested without a valid warrant or written notice of parole violation and that the arresting officer never showed him a warrant.  In addition, Beck asserted that the Parole Board failed to consider an alternative to reincarceration, such as supervised parole, maximum supervision or house arrest.  All claims were rejected on their merits.

When plaintiff's custody status was being set, defendant Crum reviewed the information related to the crime for which plaintiff was convicted. Crum and Whaley both state that the report of parole violation was not considered in setting Beck's custody status and in his latest progress review. (*See* Doc. #40, Special Report, at Exs. A & B). Instead, the facts of the murder for which Beck was committed were considered. The available documents reflected that Beck shot (or stabbed) the victim and left, but he later returned and shot (or stabbed) the victim at least twice more. According to the Alabama Department of Corrections classification manual, an offense of this nature, involving three or more shots or stabs to the victim's body, calls for "restricted offender" status. Beck thus would be eligible for minimum-in custody at a Level IV institution. However, the murder conviction makes him ineligible for work release, and the multiple wounds to the victim make him ineligible for any custody or placement that might allow Beck any unsupervised contact with the public.

Beck challenged his classification in the state courts, contending he was improperly classified as a sex offender. However, the Alabama Court of Criminal Appeals stated in its opinion, "Here, the affidavit submitted by the DOC in support of its motion to dismiss established that Beck's classification as a 'restricted offender' was based on the circumstances resulting in Beck's conviction for murder--conduct

18

that occurred before his term of incarceration began." *Beck v. Alabama Bd. of Pardons and Paroles*, 907 So.2d 1096, 1100 (Ala.Crim.App. 2005).

Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). *Res judicata* makes a final, valid judgment conclusive on the parties, and those in privy with them, as to all matters, fact and law, that were or should have been adjudicated in the proceeding. *First Alabama Bank of Montgomery, N.A. v. Parsons Steel, Inc.*, 747 F.2d 1367 (11th Cir. 1984); *Ultracashmere House, Ltd. v. Meyer*, 664 F.2d 1176 (11th Cir. 1981). Privity can exist where there is a sufficient commonality of interests between the parties to the two suits or where a party to the second suit is so closely related to the interests of the party in the first suit as to be fairly considered to have had his day in court. *In re Gottheiner*, 703 F.2d 1136 (9th Cir. 1983); *Hurt v. Pullman, Inc.*, 764 F.2d 1443 (11th Cir. 1985). *See also Mitchell v. Humana Hospital-Shoals*, 942 F.2d 1581 (11th Cir. 1991); *Carlisle v. Phenix City Bd. of Educ.*, 849 F.2d 1376 (11th Cir. 1988). Collateral estoppel or issue preclusion means that "preclusive effect will be given to the adjudication of an issue litigated in a prior proceeding if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue

was necessary in the prior action." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

The application of these doctrines to Beck's case forecloses him from arguing that defendants have violated his constitutional rights with regard to either the parole revocation proceedings or his subsequent classification by DOC officials as a restricted offender. Further, a prison inmate has no constitutional right to a particular classification. *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Montanye v. Haymes*, 427 U.S. 238, 242 (1976); *Jones v. Diamond*, 594 F.2d 997, 1015 (5th Cir. 1979). Inmate classification is a matter of prison management with which federal courts are reluctant to interfere. *Young v. Wainwright*, 449 F.2d 338, 339 (5th Cir. 1971). Alabama's process of determining the custody of its inmates has been held to be "reasonable and appropriate." *Hendking v. Smith*, 781 F.2d 850, 852 (11th Cir. 1986). There is no evidence that the classification system has been applied to Beck maliciously or in bad faith. *See Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991).

The Supreme Court case of *Heck v. Humphrey*, 512 U.S. 477 (1994), also establishes that plaintiff's claims regarding his parole revocation cannot be pursued:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on

> direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486-87. In this case, plaintiff has not shown that his conviction has been overturned or vacated. In fact, the validity and constitutionality of his parole revocation proceedings have been upheld by this court.

Plaintiff has sued defendants in their official capacities. However, defendants Feehan, White, Crum and Whaley are employees of the State of Alabama and cannot be held liable in damages, in their official capacities, for his acts because they have Eleventh Amendment immunity. Such officers are entitled to dismissal of any claims for damages brought against them in their official capacities as state officials. The United States Supreme Court has stated:

> [T]here can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit. *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 341, 89 L.Ed.2d 389 (1945); *Worcester County Trust Correctional Officer v. Riley*, 302 U.S. 292 58 S.Ct. 185, 82 L.Ed.2d 269 (1937). Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I sec. 14, of the Alabama Constitution, which provides that "the State of Alabama

> shall never be made a defendant in any court of law or
> equity."

*Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *see also*, *Pennhurst State Sch. and Hosp.*

*v. Halderman*, 465 U.S. 89, 98 (1984).  To the extent these defendants are sued in

their official capacities, the suit against them is a suit against the State of Alabama.

There has been no consent or waiver in this action; thus, defendants Feehan, White,

Crum and Whaley, in their official capacities, are absolutely immune from damages

liability in this action.  Defendant Ashley also is considered a state actor and is

immune from suit in his official capacity.  *See Dean v. Barber*, 951 F.2d 1210, 1215

n.5 (11th Cir. 1992); *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1525-26

(11th Cir. 1990).

In addition, Feehan is entitled to immunity from damages in his individual

capacity for his actions as a parole officer, and White is entitled to immunity in her

individual capacity for her actions as a hearing officer.  *See Holmes v. Crosby*, 413

F.3d 1256 (11th Cir. 2005); *Hughes v. Chesser*, 731 F.2d 1489 (11th Cir. 1984);

*Farrish v. Mississippi State Parole Bd.*, 836 F.2d 969 (5th Cir. 1988); *Spaulding v.*

*Nielsen*, 599 F.2d 728 (5th Cir. 1979); *Thompson v. Burke*, 556 F.2d 231, 236 (3d Cir.

1977); *Crosby-Bey v. Jansson*, 586 F.Supp. 96 (D.D.C. 1984); *Hall v. Schaeffer*, 556

F.Supp. 539, 544 (E.D.Pa. 1983).

22

## CONCLUSION

Based on the foregoing, the Court finds that defendants' motions for summary judgment are due to be granted.   A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

Done this <u>16th</u> day of <u>February 2006</u>.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153